## Caskey et al. v. Bradley.

Jan. 22, 1943.

790

James C. Clay for appellant.

Charles M. Russell for appellee.

OPINION OF THE COURT BY JUDGE SIMS—Affirming.

The appellee, Sam Bradley, sued O. C. Caskey and Clayton Johnson for $340.67 alleged to be his share of profits in a joint adventure upon which the three had entered. Caskey alone answered and denied the material averments of the petition, and by way of counterclaim alleged Bradley was indebted to him in the sum of $411.50 for scrap material he had purchased from Bradley but which was not delivered by the latter. Without objection the case was tried before the chancellor as if it were a settlement of a partnership. After hearing the proof he rendered judgment in favor of Bradley against Caskey and Johnson for $167.58; dismissed the counterclaim; and Caskey appeals.

But two questions are presented by the appeal, both of which are factual: (a) Did Caskey agree with Bradley to a division of profits? (b) Were there any profits?

Johnson located certain scrap material owned by the Block Cannel Coal Company situated at its mine near Cannel City, Kentucky, which he thought was a great bargain at $1,000. He bought this scrap from the company's general manager, Guy Leslie, to whom he gave a check for $50 on the purchase price on Sept. 18, 1939, and was allowed four days, or until the 22nd, to pay the remaining $950. Johnson was unable to raise this money and went to Bradley, who agreed to pay the $950 with the understanding that the two would divide the profits equally after being reimbursed for what they put into the deal, and after satisfying all expenses. Bradley gave the coal company a check for $950 which his bank did not honor be-

cause of lack of sufficient funds in his account. So with Johnson's consent that the net profits might be divided three ways, Bradley went to see his friend, Caskey, to interest him in the deal.

Bradley testified Caskey agreed to furnish $1,000 to pay for the scrap material under an oral agreement that he would first be reimbursed for the cost price and expenses in handling the material and hauling it to market, and the net profits would be divided equally among Bradley, Caskey and Johnson. But Caskey's testimony was that Bradley came to him very much concerned over the fact that he had given a "cold" check for $950 and pleaded with Caskey to take over the entire deal and thereby save him from a prison term on account of having given the check; that after this call from Bradley he accompanied the latter to Cannel City where Bradley showed him the material he would get; that on Sept. 23rd, Caskey paid the company $1,000 (there being some question raised about Johnson's $50 check), and individually became the owner of the scrap material. Although he was one day late in paying for the material under the company's agreement with Johnson, it accepted his check.

While the material was being trucked to Mansbach Metal Company at Ashland, the Wolverine Coal Company contended some of its property was taken and it stopped the trucks. When this happened, Caskey, Johnson and Bradley all went to Cannel City in the latter's car and straightened out the tangle. Of the 26 tickets issued by Mansbach showing the purchase of this material, all were made to Caskey except one to Johnson, but the tickets were turned over to Bradley by Caskey. An argument arose between Bradley and Caskey when the former demanded his part of the profits, and Johnson walked away and took no part in the controversy. Johnson admitted on the witness stand that he and Bradley had an agreement as to a division of the profits, but he testified he did not know what agreement Caskey had made with Bradley. He steadfastly refused to answer on the stand the question of whether or not he had stated in a garage of Caskey's brother in the presence of several persons that Caskey alone was interested in the deal. Caskey materially weakened his testimony by so strongly pressing Bradley's fear of prosecution on account of his check not being good. The coal company had not parted with title to the material and were withholding

delivery until the check was paid, therefore it is doubtful if Bradley feared prosecution.

The evidence is conflicting as to whether Caskey purchased this material outright for his own use and benefit, or whether he purchased it under an oral agreement with Bradley, that after being reimbursed for the purchase price and expenses, the profits would be equally divided among the three of them. The most that we can say is that the mind is left in doubt, which is not sufficient to authorize a reversal of the judgment. Martyn v. Jacoby's Adm'r, 223 Ky. 674, 4 S. W. (2d) 684; Stimson's Ex'x v. Tharp, 284 Ky. 389, 144 S. W. (2d) 1031.

Again, there is much conflict in the testimony as to what, if any, profits Caskey made out of this transaction. He testified there was no profit because there was included in the property Bradley sold him $411.50 worth of material which belonged to the Wolverine Company to which he never obtained title. However, Bradley executed to Caskey a bill of sale which itemized the property sold, and the Wolverine property claimed by Caskey was not included therein. Therefore, the chancellor correctly dismissed Caskey's counterclaim.

Caskey filed 32 checks representing his expenses in handling this material, but they shed little light on the situation. Three of these bear dates previous to Sept. 23, 1939, the date he made the deal. Some do not show for what purpose they were given; others show a purpose wholly foreign to this transaction; and three or four of them bear a date subsequent to the date they went through the Cincinnati Clearing House.

Then there is a direct conflict in the evidence as to how much Caskey received for this material. He kept practically no records of his receipts and expenditures on the transaction. While there may be some doubt in our minds as to whether the chancellor correctly adjudged the gross receipts by him were $2,170.01 with total expenses of $1,667.27, leaving a profit of $502.74, such doubt does not authorize us to reverse the judgment under the authorities cited in the second preceding paragraph.

There is no disagreement on the law controlling this case. If the contract was as Bradley claims he made with Caskey, the parties entered upon a joint adventure, which may be likened to a simple limited partnership

formed for a single purpose and covered by the same rules of law. Pawley v. Glasscock, 236 Ky. 821, 34 S. W. (2d) 729, and authorities therein cited. Men may enter into an agreement that one will pit his money against the other's skill, knowledge or judgment and divide the proceeds as they see fit, and such an agreement becomes a valid contract. McCormick v. Stofer, 12 S. W. 151, 11 Ky. Law Rep. 398; Stuart v. Harmon, 72 S. W. 365, 24 Ky. Law Rep. 1829. The intention of the parties, as determined by their acts, words and conduct, is the controlling element in determining whether or not a partnership exists. Boreing v. Wilson, 128 Ky. 570, 108 S. W. 914.

The judgment is affirmed.